IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| YASHODA DEVI GURUNG, *Administratrix* of the Estate of Karna Maya Mongar, deceased<br>*Plaintiff*<br><br>v.<br><br>CITY OF PHILADELPHIA DEPARTMENT OF PUBLIC HEALTH and DONALD F. SCHWARZ, M.D., M.P.H. HEALTH COMMISSIONER AND DEPUTY MAYOR FOR HEALTH AND OPPORTUNITY<br>*Defendants* | CIVIL ACTION<br><br>NO. 11-7235 |

NITZA I. QUIÑONES ALEJANDRO, J.                                                                    August 7, 2014

## MEMORANDUM OPINION

### INTRODUCTION

Before this Court is a motion filed by Defendants City of Philadelphia ("City")[1] and Donald F. Schwarz ("Schwarz") (collectively "Defendants") pursuant to Federal Rule of Civil Procedure (Rule) 12(b)(6), which seeks to dismiss the 42 U.S.C. §1983 ("§1983") civil rights claims asserted against them in the amended complaint. [ECF 21]. Yashoda Devi Gurung ("Plaintiff") has opposed the motion. [ECF 22]. Defendants filed a reply to the opposition. [ECF 25]. Therefore, the motion is ripe for disposition.

For the reasons that follow, the motion to dismiss is granted.

---

[1] Although the amended complaint names the City of Philadelphia Department of Public Health ("Department") as defendant, the Department does not have an independent existence from the City. Therefore, all claims against the Department must be brought against the City. *See Costobile-Fulginit v. City of Philadelphia*, 719 F. Supp.2d 521, 525 (E.D. Pa. 2010) (citing 53 P.S. §16257; *Burton v. City of Philadelphia*, 121 F. Supp.2d 810, 812 (E.D. Pa. 2000)). In recognition of their agreement on this issue, on August 4, 2014, the parties filed a stipulation in which they agreed to substitute the City for the Department. [ECF 27]. This Court, therefore, will proceed as though Plaintiff's claims were asserted against the City rather than the Department.

**FACTUAL BACKGROUND**

This case arises out of the tragic death in 2009 of Karna Maya Mongar ("Mongar"), Plaintiff's mother, from a medical procedure performed by Kermit B. Gosnell, M.D. ("Gosnell") at his clinic that went drastically wrong. On November 18, 2011, Plaintiff filed this action on her own behalf and as Administratrix of her mother's estate, against the City of Philadelphia Department of Public Health ("PDPH") and Donald F. Schwarz, M.D., Philadelphia's Health Commissioner and Deputy Mayor for Health and Opportunity. [ECF 1].[2] On October 2, 2013, Plaintiff filed an amended complaint asserting claims under §1983 for the violation of her mother's substantive due process rights and that Defendants adopted and implemented a "policy of inaction" that ultimately cost Mongar's life. [ECF 20]. On October 17, 2013, Defendants filed the instant motion to dismiss the amended complaint. [ECF 21].

When ruling on the motion to dismiss, this Court must accept, as true, all relevant and pertinent factual allegations in Plaintiff's amended complaint. These allegations are briefly summarized as follows:

> Prior to her death in 2009, Mongar, a resident of Virginia, was a patient of Gosnell and his clinic, the Women's Medical Society (the "Clinic"). (Amend. Comp. ¶¶5, 48-49). Plaintiff alleges that Gosnell was the only licensed professional providing care at the Clinic. (*Id.* at ¶50).
>
> According to the Clinic's records, on November 18, 2009, Mongar went to the Clinic for a dilation and evacuation (D&E) procedure but was told to return the next day. (*Id.* at ¶54). When she returned on November 19, 2009, Mongar was administered medications by Lynda Gayle Williams ("Williams"), an unlicensed employee who worked under the direction of Gosnell. (*Id.* at ¶¶52, 53, 55). Although the amended complaint does not mention when and what medication was administered to Mongar, Plaintiff alleges that Gosnell was not present at the Clinic. (*Id.* at ¶56).

---

[2] Upon a joint request of the parties, this matter was stayed pending the completion of the murder trial of Dr. Gosnell. [ECF 4]. By Order dated May 29, 2013, this matter was restored to active status [ECF 7] and, subsequently, reassigned to the undersigned by Order dated July 19, 2013. [ECF 14].

At approximately 6 p.m., Mongar began to experience cramping. (*Id.* at ¶57). Williams contacted Gosnell by cell phone and he directed her to administer to Mongar by syringe Demerol and Promethazine. (*Id.* at ¶58). Approximately an hour later, Mongar again began to feel cramps. (*Id.* at ¶59). Gosnell was still not present. (*Id.* at ¶59). At approximately 7:36 p.m., Williams again contacted Gosnell by cell phone. (*Id.* at ¶60). According to the Clinic's medical records, at 8:14 p.m. and 10:45 p.m., Williams administered a local anesthetic to Mongar and moved her into the procedure room, where Gosnell, at some point, began the D&E procedure. (*Id.* at ¶61). The medical records reveal that Mongar's pulse, respirations, blood pressure, cardiac rhythm, oxygen pulse and anesthesia level were not monitored during the procedure. (*Id.* at ¶62). These records also reveal that at 11:10 p.m., the D&E procedure was completed and Mongar's condition was listed as good. (*Id.* at ¶63).

The records of the Philadelphia EMS, however, reveal different facts. According to those records, at 11:11 p.m., the EMS was notified that Mongar had become unresponsive almost 10 minutes earlier from an unknown cause. (*Id.* at ¶64). These records also indicate that an ambulance arrived at the Clinic at 11:13 p.m., and that the EMS personnel found Mongar in an examination room on an O/B type bed, unresponsive, with no respiratory effort or pulse. (*Id.* at ¶65). Mongar was transported to the Hospital of Pennsylvania (HUP) where she was pronounced dead. (*Id.* at ¶67).

Gosnell was subsequently arrested, charged, and convicted of involuntary manslaughter for Mongar's death. (*Id.* at ¶68).

In support of the allegations that Defendants adopted and implemented a "policy of inaction," Plaintiff's amended complaint describes in great detail the numerous failures by the PDPH and Defendant Schwarz to enforce various health code regulations directed at the Clinic and Gosnell despite having knowledge of the regulatory violations and unsanitary conditions at the Clinic; *to wit*:

Plaintiff alleges that between the years 2001 and 2007, PDPH employees visited the Clinic and reported problems with the refrigeration of vaccines, vaccine administration record-keeping and expired vaccines. (*Id.* at ¶¶27-46). While these visits resulted in the Clinic's repeated suspension from a vaccine program (*Id.* at ¶33), the Clinic was allowed to continue operating as a health care facility. (*Id.* at ¶35).

In August 2003, the Environmental Engineering Division of the Department of Public Health received an anonymous complaint of aborted fetuses stored in paper bags in an employee refrigerator at the Clinic. (*Id.* at ¶¶28-29).

3

As a result, Mandi Davis ("Davis"), a sanitation specialist from said division, requested that a site visit be conducted. (*Id.* at ¶30). PDPH has no record that a site visit was done. (*Id.* at ¶30).

A year later, on March 28, 2004, Davis sent Gosnell a letter indicating that an infectious waste plan that Gosnell had submitted was incomplete. (*Id.* at ¶31). Davis sent a follow-up letter a month later. (*Id.* at ¶31). Four days later, a city health department inspector went to the Clinic and reported: (1) boxes of infectious waste were on the basement floor and not raised as required; (2) red bag containers for infectious waste did not have lids; (3) red bags for pick-up were not properly stored in the basement; (4) proper labels were missing from the areas where waste was stored; and (5) the Clinic had not contracted with a disposal company. (*Id.* at ¶32).

On July 16, 2008, Lori Matijkiw ("Matijkiw"), a City investigator, conducted an inspection of the Clinic and reported her findings to her supervisors, *to wit*: (a) a freezer at the Clinic contained 3-4 plastic containers with bloody fetuses, stored along with chicken pox vaccines; (b) blood spilled/frozen on the floor of the freezer; (c) Clinic staff admitted that Gosnell was unfamiliar with the vaccine program; (d) staff members were "clueless;" (e) vaccines with expired dates; (f) a lack of files showing the administration of vaccines; (g) incomplete and/or nonexistent temperature logs for the storage of vaccines in the refrigerator; (h) overall lack of cleanliness; (i) the odor of urine; (j) a dark layer of dust on baseboards; (k) enormous fish tanks filled with murky water, (*Id.* at ¶38), and that Gosnell had been disciplined in the past. (*Id.* at ¶39). Despite Matijkiw's report, Defendants undertook no action to shut down the Clinic. (*Id.* at ¶40).

On October 7, 2009, Matijkiw returned to the Clinic and reported to her supervisors that: (a) Dr. O'Neill was not licensed to practice in Pennsylvania and falsely claimed to have a Delaware medical license; (b) patients were being escorted into the procedure area when Gosnell was not present; (c) the Clinic was falsely counting abortion patients as vaccine patients; (d) children who allegedly received vaccines did not present to the Clinic; (e) vaccines with expired dates; (f) lack of temperature logs relating to the refrigeration of vaccines; and (g) Dr. O'Neill's lack of understanding as to the vaccine program. (*Id.* at ¶44). Despite Matijkiw's second report, the Clinic continued to operate. (*Id.* at ¶45). One month later, on November 20, 2009, Mongar died while undergoing the D&E procedure in the Clinic. (*Id.* at ¶47).

## LEGAL STANDARD

When considering a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal

4

conclusions." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). The court must determine "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (*quoting Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). The complaint must do more than merely allege the plaintiff's entitlement to relief; it must "show such an entitlement with its facts." *Id.* (citations omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)) (alterations in original). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice." *Id.* To survive a motion to dismiss under Rule 12(b)(6), "a plaintiff must allege facts sufficient to 'nudge [his] claims across the line from conceivable to plausible.'" *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 570).

## DISCUSSION

In the amended complaint, Plaintiff asserts §1983 civil rights claims against Defendants contending that they violated Mongar's substantive due process rights under the Fourteenth Amendment. To state a claim under §1983, a plaintiff must allege the violation of a right secured by the Constitution and/or laws of the United States and must show that the alleged deprivation was committed by a person acting under color of state law. *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999); *Morrow v. Balaski*, 719 F.3d 160, 165-66 (3d Cir. 2013). Section 1983 does not provide substantive rights, but instead, "provides a remedy for the

5

deprivations of rights established elsewhere in the Constitution or federal laws." *Kopec v. Tate*, 361 F.3d 772, 775-76 (3d Cir. 2004). Thus, to establish a §1983 violation, Plaintiff must allege facts sufficient to establish that Defendants, acting under color of state law, deprived Mongar of a right secured by the Constitution or by federal law.[3] *See Robb v. City of Philadelphia*, 733 F.2d 286, 290-91 (3d Cir. 1984).

A governmental entity, however, may not be held liable under §1983 for constitutional violations caused solely by its employees or agents under the principle of *respondeat superior*. *Monell v. New York Department of Social Services*, 463 U.S. 658, 690 (1978). Rather, a municipality may be held liable under §1983 for monetary, declaratory, or injunctive relief where the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. *Id.* at 694. Thus, liability may be imposed on a municipality only where its official "policy or custom" "causes" an employee to violate another person's constitutional rights. *Id.*; *see also Brown v. School Dist. of Philadelphia*, 456 F. App'x 88, 90 (3d Cir. 2011) (citing *Santiago v. Warminster Twp.*, 629 F.3d 121, 135 (3d Cir. 2010)). A governmental policy or custom can be established in two ways:

> Policy is made when a "decision maker possess[ing] final authority to establish municipal policy with respect to the action" issues an official proclamation, policy, or edict. A course of conduct is considered to be a "custom" when, though not authorized by law, "such practices of state officials [are] so permanent and well-settled" as to virtually constitute law.

*Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990). "Custom requires proof of knowledge and acquiescence by the decision maker." *McTernanan v. York*, 564 F.3d 636, 658 (3d Cir. 2009). In either instance, "a plaintiff must show that an official who has the power to

---

[3] For purposes of §1983, it is undisputed that Defendants were state actors at the time of the relevant events.

6

make policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom." *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990); *see also Andrews*, 895 F.2d at 1480. In addition, for municipal liability to arise, a plaintiff must first show an underlying constitutional violation. *See Marable v. West Pottsgrove Twp.*, 176 F. App'x 275, 283 (3d Cir. 2006) for the proposition that "a municipality may not incur *Monell* liability as a result of the actions of its officers when its officers have inflicted no constitutional injury."

Therefore, to state a §1983 claim against Defendant City, Plaintiff must allege facts to demonstrate: (1) the deprivation of a constitutional right; and (2) that such deprivation arose out of an official policy or custom of the City. For liability to attach to an individual defendant, such as Defendant Schwarz, he "'must have [had] personal involvement in the alleged wrongdoing; liability cannot be predicated solely on the operation of respondeat superior. Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence.'" *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (citations omitted). Thus, with these legal principles in mind, this Court will address Plaintiff's §1983 claims.

*Plaintiff's Fourteenth Amendment Due Process Claims*

Plaintiff alleges that Defendants violated Mongar's Fourteenth Amendment due process rights by "implicitly or explicitly adopt[ing] and implement[ing] careless and reckless policies, customs, or practices, that included, among other things, failing to enforce the regulations designed to protect the public health, which affirmatively permitted the health and safety of Gosnell's patients," including Mongar, "to be placed at serious risk." (Amend. Comp. ¶85). The Fourteenth Amendment provides that a state shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, §1. While courts recognize

7

that the Due Process Clause protects an individual's interest in his or her bodily integrity, the Constitution, however, imposes no affirmative duty on municipalities to protect citizens from the acts of private individuals. *Deshaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 195-96 (1989); *Morrow*, 719 F.3d at 166. Specifically, in *DeShaney*, the Supreme Court noted that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." *Id.* at 195. "Its purpose was to protect the people from the State, not to ensure that the State protected them from each other." *Id.* at 196.

The Third Circuit has held that *DeShaney* "stands for the harsh proposition that even though state officials know that a person is in imminent danger of harm from a third party, the fourteenth amendment imposes upon those state officials no obligation to prevent that harm." *Horton v. Flenory*, 889 F.2d 454, 457 (3d Cir. 1989); *see also Morrow*, 719 F.3d at 166 (stating as "a general matter . . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause.") (quoting *DeShaney*). Notwithstanding, the Third Circuit has also concluded that a state may be liable for its failure to protect its citizens against private violence when the state (1) enters into a "special relationship" with the plaintiff or (2) creates a danger which results in foreseeable injury to a discrete plaintiff. *See Ye v. United States*, 484 F.3d 634, 637 (3d Cir. 2007); *Kneipp v. Tedder*, 95 F.3d 1199, 1205 (3d Cir. 1996). Here, Plaintiff asserts her claim under both of these theories.

### 1. Special Relationship Exception

As stated, while government entities generally do not have a constitutional obligation to protect citizens from the conduct of private individuals, the Constitution does "impose[] upon the State affirmative duties of care and protection" where a "special relationship" exists between the

8

state and a particular individual. *Morrow*, 719 F.3d. at 167. A state actor's duty to protect such citizens does not arise merely from the state actor's "knowledge of the individual's predicament or from its expressions of intent to help him . . . ." *Id.* at 168. Rather, such a duty arises only where the state actor takes a person into its custody without consent, and by virtue of this custody, limits the individual's freedom to act. *Id.* A "special relationship" exists only in the limited circumstances where the state has taken a person into custody or otherwise prevented that person from helping him/herself. *Kneipp*, 95 F.3d at 1204-05. To create a "special relationship," the "state must affirmatively act to curtail the individual's freedom such that he or she can no longer care for him or herself." *Regalbuto v. City of Philadelphia*, 937 F. Supp. 374, 379-80 (E.D. Pa. 1995), *aff'd*, 91 F.3d 125 (3d Cir. 1996); *see also Torisky v. Schweiker*, 446 F.3d 438, 446 (3d Cir. 2006) (holding that the special relationship exception "must be confined to cases in which a person is taken into state custody against his will.").

Plaintiff contends that "a custodial relationship was formed when PDPH undertook the duty to inspect the Clinic and when it allowed the Clinic to continue to operate in its then-existing state." (Plaintiff's Br. at 24). Plaintiff has not cited any case nor is this Court aware of any case that would support the creation of a special relationship under these facts. To the contrary, these facts do not fall within those limited circumstances where courts have found the existence of a special relationship. The facts alleged do not establish that Mongar was either taken into custody without her consent or that her freedom was in any way restricted by the state. There is no allegation that any state actor compelled Mongar to go to Dr. Gosnell for medical treatment. Rather, it was Mongar who voluntarily decided to seek treatment at the Clinic. Based on the specific facts alleged and the case law cited above, this Court cannot find that a special relationship existed between Mongar and Defendants.

9

*2. State-Created Danger Exception*

As to the so-called "state-created danger" exception, this doctrine was adopted in the matter of *Kneipp v. Tedder*, 95 F.3d 1199, 1205 (3d Cir. 1996), and is a narrow exception to the general rule that the due process clause of the Fourteenth Amendment does not impose an affirmative obligation on states to protect their citizens from private harms. *Henry v. City of Erie*, 728 F.3d 276, 286 (3d Cir. 2013). The state-created danger doctrine provides that a state may be held liable where it "acts to *create* or *enhance* a danger that deprives the plaintiff of his or her Fourteenth Amendment right to substantive due process." *Morrow v. Balaski*, 719 F.3d 160, 177 (3d Cir. 2013) (emphasis in original). To state a claim under the state-created danger exception, Plaintiff must plead facts sufficient to satisfy each of the following prongs:

(1) the harm ultimately caused was foreseeable and fairly direct;

(2) a state actor acted with a degree of culpability that shocks the conscience;

(3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and

(4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*See Bright v. Westmoreland County*, 443 F.3d 276, 281 (3d Cir. 2006). In the analysis of the state-created danger exception, negligent conduct does not rise to the level of culpability that shocks the conscience. *Kaucher v. County of Bucks*, 455 F.3d 418, 426 (3d Cir. 2006).

In their motion to dismiss, Defendants argue that the facts alleged in Plaintiff's amended complaint fail to satisfy the elements of the second and fourth prongs. This Court agrees that Plaintiff has failed to meet the elements of the fourth prong. In addition, in light of the recent decision of *Henry v. City of Erie*, 728 F.3d 275 (3d Cir. 2013), this Court finds that Plaintiff has not met the elements of the first prong. Consequently, the analysis of the state created danger

exception will be limited to the fourth and first prongs, in said order. *See Morse v. Lower Merion School Dist.*, 132 F.3d 902, 914 (3d Cir. 1997) (holding that the failure to meet *any one* of the elements requires dismissal of claim)(emphasis added).[4]

### *Fourth prong analysis*

As noted, the fourth prong of the state-created danger exception requires a plaintiff to allege facts to establish that state actors "used their authority to create an opportunity that otherwise would not have existed." *Kneipp*, 95 F.3d at 1208. Therefore, Plaintiff must allege facts showing that Defendants: (1) exercised their authority; (2) took an affirmative action; and (3) said action created a danger to Mongar or rendered her more vulnerable to danger than had Defendants not acted at all. *See Ye*, 484 F.3d at 639. "[I]t is [the] misuse of state authority, rather than a failure to use it, that can violate the Due Process Clause." *Bright*, 443 F.3d at 282. In other words, "[l]iability under the state-created danger theory is predicated upon the states' affirmative acts which work to the plaintiffs' detriments in terms of exposure to danger." *D.R. v. Middle Bucks Area Vocational Tech. Schl.*, 972 F.2d 1364, 1374 (3d Cir. 1992). To satisfy this fourth prong, Plaintiff must also allege facts to establish "a direct causal relationship between the affirmative act of the state and plaintiff's harm." *Kaucher*, 455 F.3d at 432 (explaining that "the fourth element is satisfied where the state's action was the 'but for cause' of the danger faced by the plaintiff.").

In a recent decision, *Morrow v. Balaski*, 719 F.3d 160 (3d Cir. 2013), the Third Circuit provided guidance for distinguishing "affirmative acts" from "omissions" in the state-created danger context. In *Morrow*, the plaintiffs alleged that school authorities permitted a criminally adjudicated delinquent to return to school after serving a suspension for assaulting two fellow

---

[4] This Court makes no findings as to whether Plaintiff has alleged facts sufficient to meet any of the other elements.

students. *Id.* at 164. Upon her return, school authorities allowed the delinquent student to board a bus on which one of the two students she had assaulted was riding. *Id.* The plaintiffs argued that the school created a danger by affirmatively permitting the delinquent student to return to school rather than expelling her. *Id.* at 179. Rejecting the plaintiffs' argument, the Third Circuit held that plaintiffs could not satisfy the fourth prong of the state-created danger exception by merely recasting the omissions upon which the claims were based as affirmative acts. "[M]erely restating the Defendants' inaction as an affirmative failure to act does not alter the passive nature of the alleged conduct." *Id.*

Similarly, Plaintiff here contends that "Defendants' conscious and deliberate decision to sanction the actions of the Clinic and allow it to operate unchanged, over a sustained period of time, fully knowing and appreciating that such decision put women's health at significant risk, constitutes an affirmative action." (Plaintiff's Br. at 17). While Plaintiff attempts to characterize her claims as being based upon Defendants' affirmative acts and not on Defendants' omissions and/or failures to act, a fair reading of the amended complaint demonstrates otherwise. Indeed, a fair reading of Plaintiff's amended complaint reveals allegations that Defendants failed to take affirmative action to correct the deficiencies noted during routine inspections of the Clinic, and stood idly by notwithstanding their knowledge of various regulatory violations existing at the Clinic. Briefly, Plaintiff's claims are premised as follows:

- "Contrary to the duties, responsibilities, and obligations of PDPH, PDPH did not safeguard the public's health." (Amend. Comp. ¶25);

- "failing to insure Gosnell or the Clinic complied with Federal, State and/or City laws, ordinances, and regulations." (*Id.* at ¶26);

- "failing to properly regulate Gosnell . . ." (*Id.* at ¶27);

- "failing to meet the duties set forth in its own regulations and Mission Statement." (*Id.* at ¶81);

- "failing to enforce the regulations designed to protect the public health" (*Id.* at ¶85); and,

- "failure of the Defendants to implement appropriate policies, customs and practices . . . ." (*Id.* at ¶87).

Plaintiff's attempt to frame these alleged "failures" as affirmative acts, however, "does not alter the passive nature of the alleged conduct." *Morrow*, 719 F.3d at 179. As in *Morrow*, Plaintiff's re-characterization of Defendants' failures to act as affirmative acts is insufficient to meet the fourth prong of the state-created danger exception.

In many respects, this case is similar to *Kaucher v. County of Bucks*, 455 F.3d 418 (3d Cir. 2006), in which the Third Circuit also drew a distinction between omissions and affirmative acts. In *Kaucher*, the plaintiffs, a corrections officer and his wife, asserted a due process-based §1983 claim against a county and several county employees. *Id.* at 420. The Kauchers premised their claim on the defendants' failure to correct or improve what were alleged to be unsanitary conditions at the county jail where plaintiff worked, inaction that allegedly caused plaintiff to contract methicillin resistant staphylococcus aureus. *Id.* at 420. While the plaintiffs attempted to frame their claims as being based upon affirmative acts by the defendants, the Court concluded that the claims were, in fact, based upon the defendants' alleged omissions. *Id.* at 433. Relying upon its numerous decisions precluding §1983 claims based upon a defendant's alleged omissions and/or failures to act, the appellate court held that the plaintiffs' allegations of the defendants' failures to take affirmative actions to improve safety conditions were "insufficient to trigger substantive due process liability." *Id.* at 435.

Like the plaintiffs in *Kaucher*, Plaintiff attempts to characterize her claims as being based on affirmative acts of the Defendants. As discussed above, however, the facts alleged establish

only omissions and/or failures to act, not the requisite affirmative act. As the Third Circuit has repeatedly opined, a plaintiff cannot convert what are clearly a defendant's omissions into affirmative acts through wordsmith. Here, as stated, Plaintiff's claims are premised upon Defendants' numerous alleged failures to take affirmative acts to improve the unsanitary conditions at the Clinic and the compliance with regulatory requirements. Under the well-settled case law, such "omissions are insufficient to trigger substantive due process liability." *Kaucher*, 455 F.3d at 435.

In her response, however, Plaintiff relies on the Third Circuit's decision in *Kneipp*, 95 F.3d 1199 (3d Cir. 1996) in support of her claims. This reliance is misplaced. In *Kneipp*, the parents of Samantha Kneipp ("Kneipp") brought §1983 claims against the City of Philadelphia and some of its police officers after Kneipp suffered severe brain damage from a fall down an embankment following an encounter with the police. *Id.* at 1202-03. Plaintiffs alleged that after stopping the visibly-intoxicated Kneipp and her husband shortly after midnight for causing a disturbance on the highway, police officers separated the two, thereby forcing Kneipp to walk home alone intoxicated. *Id.* Kneipp never made it home, but was later found unconscious at the bottom of an embankment not far from her home. *Id.* at 1203. The Third Circuit therein concluded that plaintiffs had alleged sufficient facts to allow their state-created danger claim to proceed. *Id.* at 1201. As the Third Circuit explained, "a jury could find [the affirmative act element] satisfied where officers used their authority ***to separate*** an intoxicated woman from her husband ***and send her home*** unescorted." *Kaucher v. County of Bucks*, 455 F.3d 418, 432-33 (3d Cir. 2006) (explaining its previous decision in *Kneipp*) (emphasis added). As such, it was not the fact that the police did nothing and allowed Kneipp to walk home alone that created the

liability, but rather the police officers' affirmative acts of separating Kneipp from her husband and sending her home alone while intoxicated that placed her in danger.

Here, there are no allegations that Defendant took any affirmative action which placed Mongar in danger. To the contrary, Plaintiff has repeatedly alleged that Defendants took *no* action. Under the governing case law in this Circuit, such omissions or failures to act are insufficient to attach liability to defendants under the state-created danger exception.[5]

In addition, Plaintiff's reliance on the non-binding decisions of the Second Circuit Court of Appeals in *Dwares v. City of New York*, 985 F.3d 94 (2d Cir. 1993) and *Pena v. DePrisco*, 432 F.3d 98 (2d Cir. 2005), is equally misplaced. In *Dwares*, a civil rights protester was assaulted by a group of "skinheads" during a political rally. *Dwares*, 985 F.2d at 96. Prior to the assault, the police explicitly told the group of "skinheads" that they would not interfere with or arrest them if they beat up civil rights protesters, a group which included the plaintiff. *Id.* at 97, 99. That is, the police took affirmative actions to advise and, thereby, encourage the unlawful acts of the perpetrators. The *Dwares* court concluded that the plaintiff's allegations of defendants' "prearranged official sanction of privately inflicted injury" sufficiently stated a §1983 claim based upon a state-created danger. *Id.* at 99. Similarly, in *Pena*, the police officers actively encouraged another officer to drink excessively and to drive without fear of punishment by, *inter alia*, drinking with him and asking him to drive while intoxicated. *Pena*, 432 F.3d at 111.

---

[5] As noted by the Third Circuit in *Bright v. Westmoreland County*, 443 F.3d 276, 282 (3d Cir. 2006), it has "never found a state-created danger claim to be meritorious without an allegation and subsequent showing that state authority was *affirmatively exercised*." (emphasis added). Further, "state actors cannot 'use their authority' to create such an opportunity by failing to act." *Id.* at n. 6; *see also Brown v. Sch. Dist. of Phila.*, 456 F. App'x 88, 92 (3d Cir. 2011) (holding that a school district's "lack of affirmative action" was "fatal to [plaintiff's] §1983 claim."); *Kaucher*, 455 F.3d at 433, n. 11 (collecting cases in which Third Circuit held that a defendant's "failures to act cannot form the basis of a valid §1983 claim.").

As stated, Plaintiff herein has alleged no such affirmative conduct by Defendants. Like in *Morrow* and *Kaucher*, Plaintiff has not pled facts to establish that Defendants affirmatively acted in some fashion to place Mongar in danger or in increased danger. Rather, Plaintiff has alleged only that Defendants did not do enough to protect Mongar (or women like her) once they were aware of the deplorable, unsanitary, and dangerous conditions at the Clinic, and of the non-compliance of the public health regulations. While Plaintiff contends that these alleged omissions and failures to act caused Mongar's death, Plaintiff has failed to allege any affirmative conduct by Defendants that created a danger to Mongar or that exacerbated a danger that she would not have otherwise faced. Absent allegations of some affirmative conduct by Defendants, Plaintiff has not established a viable claim under the state-created danger exception.[6]

*First prong analysis*

This Court finds the recent decision in *Henry v. City of Erie*, 728 F.3d 275 (3d Cir. 2013), persuasive as it bears significant resemblance to the allegations and theories asserted by Plaintiff. In *Henry*, the Third Circuit considered a state-created danger claim brought by the estates of a tenant and her guest who died of smoke inhalation in a Section 8 apartment[7] which lacked a smoke detector and an alternate egress, in violation of public housing regulations. *Id.* at 277. The city agency responsible for administering the program had inspected and approved the apartment on numerous occasions, even though it had found the apartment to be in violation of applicable standards, including the lack of a smoke detector and an alternate means of egress. *Id.*

---

[6] While Plaintiff also seeks to impose liability on Defendants based upon the City's failure to follow its own practices and procedures, as alleged, Defendants' failure to follow these alleged protocols amounts to, at most, negligence, and not a constitutional violation. *Cf. Morrow*, 719 F.3d at 178 ("[W]e decline to hold that a school's alleged failure to enforce a disciplinary policy is equivalent to an affirmative act under the circumstances here.").

[7] Section 8 refers to a provision of the United States Housing Act of 1937, 42 U.S.C. §1437f, which established a housing program to help eligible low-income families afford safe and sanitary housing. *Id.*

278-279. The agency had, in fact, warned the landlord that if it did not remedy the various violations, the landlord and apartment would be terminated from the housing program. *Id.* at 279. The agency, however, never followed through on its warnings. *Id.* The Third Circuit framed the issue in *Henry* as "whether state officials' approval and subsidization of an apartment for the Section 8 housing program, even though the apartment allegedly failed to comply with Section 8's Housing Quality Standards, constitutes a state-created danger toward the apartment's tenant and her guest in violation of their substantive due process rights under the United States Constitution." *Id.* at 277. The Court concluded that the plaintiffs had failed to assert a viable state-created danger claim because the housing authority's alleged conduct – improperly approving the apartment for the housing program when it had repeatedly failed inspection for its lack of a smoke detector and secondary egress – was not "a fairly direct cause of decedents' harm." *Id.* at 283.

The Third Circuit based its decision on the plaintiffs' failure to meet the first element of the state-created danger doctrine and held that the state actor had not "created the danger faced by decedents . . . ." *Id.* at 286. The Court explained that "improper licensure will often be too far removed from the ultimate harm to permit liability under §1983" because in order to show that state officials' conduct was a "fairly direct" cause of an injury, "the plaintiff must plausibly allege that state officials' actions precipitated or were the catalyst for the harm for which the plaintiff brings suit." *Id.* at 284-85. Ultimately, the Court concluded that the agency's "approval and subsidization" of the apartment was not a fairly direct cause of the plaintiffs' injuries because "defendants' actions were separated from the ultimate harm by a lengthy period of time and intervening forces and actions." *Id.* at 285.

The Third Circuit's analysis in *Henry* applies equally here. As discussed above, while Plaintiff re-characterizes the City's omissions as affirmative acts, the essential crux of her allegations are claims that the City failed to properly enforce various regulations and improperly permitted Gosnell and the Clinic to operate despite the known violations and deficiencies. As in *Henry*, the City's alleged failure to adequately inspect or shut down the Clinic despite known violations was not the "fairly direct" cause of Mongar's death. The City's alleged inadequate inspections and enforcement of regulations were separated from the ultimate harm to Mongar by time and by the intervening criminal conduct of Gosnell, and the Clinic's own misconduct. Therefore, under the principal articulated in *Henry*, Plaintiff's allegations do not satisfy the first element of the state-created danger doctrine.

Because this Court concludes that Plaintiff has failed to allege facts to demonstrate a constitutional "violation in the first place, there can be no derivative municipal claim." *Mulholland v. Gov't Cnty. of Berks, Pa.*, 706 F.3d 227, 238 n. 15 (3d Cir. 2013); *see also Kaucher*, 455 F.3d at 423 n. 2 (declining to address viability of a *Monell* claim where court concluded there was no underlying constitutional violation). Therefore, Plaintiff's *Monell* claim is also dismissed. Similarly, in the absence of an underlying constitutional violation, there can be no individual liability on the part of Schwarz. *Cf. Deshaney*, 489 U.S. at 202 (affirming dismissal of §1983 claims against individual defendants where there was no underlying constitutional violation).

*Leave to Amend*

Although the Third Circuit has directed district courts to ordinarily provide a civil rights plaintiff an opportunity to file an amended complaint where the original complaint is subject to dismissal under Rule 12(b)(6), *see Phillips*, 515 F.3d at 245 (reiterating the rule that leave to

amend must be granted *sua sponte* in civil rights actions, "unless such an amendment would be inequitable or futile."), it is this Court's view that any such attempt to amend the complaint a second time would be legally futile. This Court has dismissed Plaintiff's civil rights claims against Defendants, not because Plaintiff has failed to provide a well-pleaded amended complaint, but rather, because the detailed facts set forth in her complaint fail, as a matter of law, to establish a constitutional violation for purposes of §1983 liability under either the "special relationship" or "state-created" danger exceptions. It is, therefore, this Court's opinion that any attempt to amend the complaint a second time would be futile.

## CONCLUSION

While the events at the Clinic were undeniably horrific and tragic, under the authoritative case law discussed, the allegations against Defendants do not rise to the level of a deprivation of the decedent's constitutionally-protected rights. Therefore, Defendants' motion to dismiss is granted and Plaintiff's claims are dismissed with prejudice. An order consistent with this memorandum opinion follows.


NITZA I. QUIÑONES ALEJANDRO, U.S.D.C. J.